**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Imran Hossain Imon, | No. CV-20-00037-PHX-DWL (JZB) |
| Petitioner, | |
| v. | **ORDER** |
| Chuck Keeton, et al., | |
| Respondents. | |

**INTRODUCTION**

In July 2018, Petitioner Imran Hossain Imon (A# 215-736-898), a citizen of Bangladesh, was apprehended by immigration authorities after entering the United States without authorization. Because Petitioner identified himself as a juvenile and possessed a birth certificate that seemed to corroborate that claim, Petitioner was classified as an unaccompanied alien child ("UAC") and placed in a juvenile facility. However, after additional investigation, government officials concluded that Petitioner was actually an adult. This "age determination" resulted in Petitioner being transferred to an adult detention facility. Immigration judges subsequently denied Petitioner's request for release on bond and denied Petitioner's request for asylum.

Petitioner has now filed, through counsel, a petition for a writ of habeas corpus under 28 U.S.C. § 2241 and a motion for preliminary injunction. For the following reasons, the Court will deny the motion, dismiss the petition, and terminate this action.

…

**BACKGROUND**

I.    <u>Background Law Concerning UACs</u>

In 2002, Congress enacted the Homeland Security Act ("HSA"), which transferred responsibility to the United States Department of Health and Human Services ("HHS") for "'coordinating and implementing the care and placement of unaccompanied alien children,' 'ensuring that the best interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child,' 'implementing policies with respect to the care and placement of unaccompanied alien children,' and identifying 'a sufficient number of qualified individuals, entities, and facilities to house' such children." *Flores v. Sessions*, 862 F.3d 863, 870 (9th Cir. 2017) (quoting 6 U.S.C. § 279(b)(1)). The HSA defines an "unaccompanied alien child," or UAC, as a child who: "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom . . . there is no parent or legal guardian in the United States; or . . . no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

In 2008, Congress enacted the Trafficking Victims Protection and Reauthorization Act ("TVPRA"). Among other things, the TVPRA required HHS, "in consultation with" the Department of Homeland Security ("DHS"), to "develop procedures to make a prompt determination of the age of an alien, which shall be used by [DHS] and [HHS] for children in their respective custody." 8 U.S.C. § 1232(b)(4). The TVPRA further provided that, "[a]t a minimum, these procedures shall take into account multiple forms of evidence, including the non-exclusive use of radiographs, to determine the age of the unaccompanied alien." *Id.*

HHS and DHS subsequently worked together to develop a set of age determination policies and procedures, which are set forth in a document entitled "ORR Guide: Children Entering the United States Unaccompanied" (hereinafter, "ORR Guide").[1]

---

[1] Petitioner provided at copy of the ORR Guide at Doc. 1-8. It can also be found at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied.

II.     Underlying Facts

On July 15, 2018, Petitioner, who is a native and citizen of Bangladesh, entered the United States without inspection near Laredo, Texas and was taken into custody by DHS. (Doc. 1-10 at 5-10; Doc. 13-2 at 2-4.) Because Petitioner stated that he was born in February 2001 (and thus under the age of 18) and possessed a birth certificate reflecting a February 2001 birthdate, he was designated a UAC. (Doc. 1-11 at 2-3.)[2] He was then transferred into the care and custody of HHS's Administration for Children and Families, Office of Refugee Resettlement ("ORR"). (*Id.*)

On July 20, 2018, ORR placed Petitioner in a juvenile facility in Phoenix, Arizona. (Doc. 1-4 at 2, 6; Doc. 13-2 at 10 ¶ 3.) Shortly thereafter, during a meeting with Case Manager Victor Villegas, Petitioner stated that he had come to the United States to live with his brother, who resided in New York. (Doc. 1-4 at 4.)

On August 4, 2018, Petitioner again met with Villegas, who advised that he had received Petitioner's "[birth certificate] trail" and would be sending out the "documents to be interpreted and verified, due to [the] language barrier." (*Id.*)

On August 7, 2018, a note was entered in Petitioner's case file stating that "further guidance" has been received from "leads" regarding Petitioner's case and, per that guidance, the birth certificate Petitioner had presented to prove his juvenile status was "to be verified" because birth certificates "were not common [in Bangladesh] until 2008." (*Id.* at 3.)

On October 17, 2018, ORR concluded that Petitioner's "correct" date of birth was in 1998 and that Petitioner was therefore not a juvenile. (Doc. 1-4 at 6.) ORR based this determination on (1) a copy of Petitioner's passport, which reflected a 1998 birth date (Doc. 13-2 at 6); and (2) a dental forensics report, which indicated an 88.5% probability that Petitioner was an adult (Doc. 13-2 at 8).[3]

---

[2]     Petitioner contends that at the time of his encounter with DHS, he told officials that his date of birth was in February 2001, but it was incorrectly entered into DHS records as February 2002. (Doc. 1-5 at 11-12; Doc. 1-11 at 2 n.1, 9.) For purposes of this order, the Court will utilize the 2001 date.

[3]     In the report, Peter Arvanitis, DDS, opined that "[b]ased upon radiographic analysis

Based this age determination, ORR "contacted" the Enforcement and Removal Operations ("ERO") division of United States Immigration and Customs Enforcement ("ICE"). (Doc. 13-2 at 3.) Petitioner was thereafter "discharged from ORR custody and taken into ERO custody." (*Id.*)

On October 18, 2018, an ICE official issued a report regarding Petitioner's age. (*Id.*) This report stated that Biometric Identification Transnational Migration Alert Program ("BITMAP") data indicated that "on his way through Central America and Mexico," Petitioner used his "true" 1998 birth date. (*Id.*) ICE thus determined that Petitioner was "no longer designated a UAC under the TVPRA." (*Id.*) ICE then determined that Petitioner "would remain in ICE custody without bond" pursuant to 8 U.S.C. § 1226(a). (Doc. 13-2 at 10 ¶ 4.)

On January 2, 2019, Petitioner, through former counsel, requested a redetermination of his custody status. (Doc. 13-2 at 12-23.) In support of this request, Petitioner submitted, among other things a bond worksheet that stated he was 17 years old (Doc. 13-2 at 15), a copy of a birth certificate that listed a February 2001 birth date (Doc. 13-2 at 21), and an identity card from a high school in Bangladesh (Doc. 13-2 at 16).

On January 22, 2019, following the custody redetermination hearing, an immigration judge ("IJ") denied Petitioner's request for release on bond, finding he was a flight risk. (Doc. 13-2 at 25.) Petitioner did not appeal the decision.

On July 16, 2019, an IJ ordered Petitioner removed from the United States and denied his application for asylum, withholding of removal, and protection under Article III of the United Nations Convention Against Torture. (Doc. 1-11.) In a memorandum decision, the IJ found Petitioner was not credible, reasoning, among other things, that it was likely Petitioner had "produced a fraudulent birth certificate to immigration officials and ha[d] continued to misrepresent his age" in immigration court. (*Id.* at 11.) In support

---

of Imran Imon, . . . the mean age for a male with third molar development equal to that of Imran Imon . . . is 20.40 plus or minus 4.02 years. The range of possible ages for such a male is 16.38 to 24.42 years. The empirical statistical probability of Imran Imon . . . having attained 18 years of age is 88.50." (Doc. 13-2 at 8.)

of this conclusion, the IJ stated that: (1) Petitioner had traveled through Central America and Mexico using a 1998 birth date; (2) when asked his age in immigration court, Petitioner had "audibly said 'hmm . . .' and paused for nearly ten seconds before responding that he was seventeen years, eleven months old," which suggested he "may have been attempting to calculate his age during th[e] extended pause"; and (3) given "the clear prevalence of Bengali as Bangladesh's predominant and official language . . . the purported [February 2001] birth certificate's exclusive use of English tend[ed] to indicate that the birth certificate [was] fraudulent." (*Id.* at 11-12.)

Petitioner, through former counsel, appealed the decision to the Board of Immigration Appeals ("BIA"). (Doc. 1-5.) In his opening brief, he challenged the IJ's adverse credibility determination, arguing that the IJ erred in finding that his birth certificate was likely fraudulent and that he had misrepresented his age. The appeal remains pending. (*Id.*)[4]

On November 4, 2019, Petitioner's current counsel emailed ICE Assistant Field Office Directors Jason Ciliberti and Cesar Topete, advising them that an incorrect age determination had been made and requesting that Petitioner be released into the care of a sponsor. (Doc. 1-7.) As attachments to the email, Counsel provided copies of Petitioner's birth certificate, consulate verification of his birth certificate, school identification, and school and immunization records, each listing a February 2001 birth date. (Doc. 1-3; Doc. 1-7.)

III. Procedural History

On January 7, 2020, Petitioner filed his § 2241 petition, naming former LPCC Warden Chuck Keeton, ICE Phoenix Field Office Director Albert Carter, ICE Assistant Phoenix Field Office Directors Cesar Topete and Jason Ciliberti, Acting DHS Secretary Chad Wolf, HHS Secretary Alex M. Azar, II, and United States Attorney General William Barr as Respondents. (Doc. 1.)

---

[4] *See* Executive Office for Immigration Review ("EOIR") Automated Case Information System, https://portal.eoir.justice.gov/InfoSystem/CourtInfo.

The Petition asserts five claims for relief. In Ground One, Petitioner asserts that his continued detention in ICE custody pursuant to his age redetermination violates the TVPRA, its implementing procedures, and the Administrative Procedure Act ("APA"). (Doc. 1 ¶¶ 67-69.) In Grounds Two and Three, Petitioner asserts that ICE's failure to consider placing him in the least restrictive setting and to make alternative-to-detention programs available to him when he reached the age of 18 violates the TVPRA and APA. (Doc. 1 ¶¶ 70-76.) In Grounds Four and Five, Petitioner asserts that his prolonged detention without an individualized hearing before a neutral decisionmaker at which the government must demonstrate that his continued detention is justified violates his substantive and procedural due process rights under the Fifth Amendment. (Doc. 1 ¶¶ 77-82.)

As relief, Petitioner asks the Court to: (1) declare that Petitioner's age determination by ORR and ICE "failed to take into account all available evidence and relied solely on an incorrect passport" in violation of the TVPRA; (2) order ORR and ICE to "immediately rescind the age redetermination"; (3) enjoin ICE and EOIR "from applying the unlawful age redetermination"; (4) declare that ICE's failure to place Petitioner in the "least restrictive setting available" and make "alternative to detention programs" available to him violates the TVPRA; (5) order ICE to consider Petitioner for, and place him in, the least restrictive setting available after taking into account whether he is a danger to himself or the community or is a flight risk, in accordance with the TVPRA; (6) order ICE to allow Petitioner to participate in "alternative to detention programs" utilizing a continuum of alternatives based on his need for supervision, including placement with an individual or organizational sponsor, or in a supervised group home, in accordance with the TVPRA; (7) in the alternative, order Petitioner's release from custody unless within seven days Respondents schedule a bond hearing before an immigration judge, at which the government must establish by clear and convincing evidence that Petitioner presents a risk of flight or danger to continue his detention, even after consideration of alternatives to detention that could mitigate any risk that Petitioner's release would present; (8) award

Petitioner reasonable attorney's fees and costs under the Equal Access to Justice Act; and (9) grant any other and further relief that the Court deems just and proper. (Doc. 1 at 30-31.)

**DISCUSSION**

I.   Standard of Review

A federal district court is authorized to grant a writ of habeas corpus under 28 U.S.C. § 2241 where a petitioner is "in custody under or by color of the authority of the United States . . . in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §§ 2241(c)(1), (3). "The writ of habeas corpus historically provides a remedy to non-citizens challenging executive detention." *Trinidad y Garcia v. Thomas,* 683 F.3d 952, 956 (9th Cir. 2012). *See also Munaf v. Geren*, 553 U.S. 674, 693 (2008); *Allen v. McCurry*, 449 U.S. 90, 98 n.12 (1980).

Habeas corpus review is not available for claims "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders," 8 U.S.C. § 1252(g), "arising from any action taken or proceeding brought to remove an alien," 8 U.S.C. § 1252(b)(9), or "challeng[ing] a 'discretionary judgment' by the Attorney General or a 'decision' that the Attorney General has made regarding [an alien's] detention or release," *Demore v. Kim*, 538 U.S. 510, 516 (2003) (discussing 8 U.S.C. § 1226(e)).[5] However, "the extent of the Government's detention authority is not a matter of 'discretionary judgment,' 'action,' or 'decision.'" *Jennings v. Rodriguez*, 583 U.S. ___, 138 S. Ct. 830, 841 (2018). Thus, "challenges to the statutory framework" authorizing detention, *Jennings*, 138 S. Ct. at 841, "questions of law" raised in the application or interpretation of detention statutes, *Leonardo v. Crawford,* 646 F.3d 1157, 1160 (9th Cir. 2011), and "constitutional claims," such as "claims that the discretionary process itself was constitutionally flawed[,] are 'cognizable in federal court on habeas

---

[5]   *See also Patchak v. Zinke*, 138 S.Ct. 897, 905 (2018) (finding that jurisdiction-stripping provision that "applie[d] '[n]otwithstanding any other provision of law,'" included "the general grant of federal-question jurisdiction, 28 U.S.C. § 1331"); 5 U.S.C. § 701(a)(1) (the APA does not apply "to the extent that . . . statutes preclude judicial review").

because they fit comfortably within the scope of § 2241,'" *Singh v. Holder,* 638 F.3d 1196, 1202 (9th Cir. 2011) (quoting *Gutierrez-Chavez v. I.N.S.*, 298 F.3d 824, 829 (9th Cir. 2002)).

II.   Analysis

    A.   **Ground One**

        1.   The ORR Guide

As noted, the TVPRA required HHS and DHS to work together to formulate a set of policies and procedures for making age determinations. 8 U.S.C. § 1232(b)(4). The resulting policies and procedures are set forth in the ORR Guide.

The ORR Guide contains several provisions that are relevant here. First, in section 1.6 (entitled "Determining the Age of an Individual without Lawful Immigration Status"), the ORR Guide contains the following broad statement concerning the "challenging" nature of making an age determination:

> Typically, DHS is the agency that apprehends individuals without lawful immigration status, including unaccompanied alien children (UAC), while HHS is the agency responsible for the care and custody of UAC transferred to its care. HHS authority to provide care and custody applies only to individuals who have not attained 18 years of age. ***Each agency acknowledges the challenges in determining the age of individuals in custody***. These challenges include, but are not limited to:
> 
> - Unavailable documentation;
> - Contradictory or fraudulent identity documentation and/or statements;
> - Physical appearance of the individual; and
> - Diminished capacity of the individual.
> 
> The TVPRA requires the age determination procedures, at a minimum, to take into account multiple forms of evidence. Accordingly, under these procedures, each case must be evaluated carefully based on the totality of all available evidence, including the statement of the individual in question.

(Doc. 1-8 at 10, emphasis added.)

Second, in section 1.6.2 (entitled "Instructions"), the ORR Guide sets forth detailed guidance concerning how an age determination should be conducted:

> Case managers should seek the following as evidence when conducting age determinations. Information from each category is not required.

- 8 -

Documentation:

- Official government-issued documents, including birth certificates. If the unaccompanied alien child in question is not in possession of original documentation, or if the authenticity of the original documentation is in question, government officials of the unaccompanied alien child's home country must be consulted in order to verify the validity of the documentation.

- Other reliable records (e.g., baptismal certificates, school records, medical records) that indicate the unaccompanied alien child's date of birth.

- Statements by individuals (including the unaccompanied alien child) determined to have personal knowledge of the unaccompanied alien child's age, and who HHS concludes can credibly attest to the age of the unaccompanied alien child:

- Statements provided by the unaccompanied alien child regarding his or her age or birth date. (An unaccompanied alien child's uncorroborated declaration regarding age is not used as the sole basis for an age determination.)

- Statements from the unaccompanied alien child's parent(s) or legal guardian(s), if such persons can be identified and contacted.

- Statements from other persons.

- Information from another government agency (Federal, State, local or foreign)

- State/local arrest records.

- Child welfare agency records.

Medical Age Assessments:

Medical Age Assessments include both the use of imaging technology, such as radiography, and physical examinations. Regarding these assessments:

- A medical professional experienced in age assessment method(s) must perform the examination, taking into account the individual's ethnic and genetic background.

- Dental and skeletal (bone) maturity assessments using radiographs may be used to determine age, but only in conjunction with other evidence.

- As no current medical assessment method can determine an exact age, best practice relies on the estimated probability that an individual is 18 or older. The examining doctor must submit a written report indicating the probability percentage that the individual is a minor or an adult.

ORR Response to Medical Age Assessments:

- The FFS supervisor must review the determination regarding the age submitted by the examining doctor.

- If an individual's estimated probability of being 18 or older is 75

> percent or greater according to a medical age assessment, and this evidence has been considered in conjunction with the totality of the evidence, ORR may refer the individual to DHS.  The 75 percent probability threshold applies to all medical methods and approaches identified by the medical community as appropriate methods for assessing age.
>
> - The FFS compiles all pertinent information (e.g., how reasonable suspicion was raised that the subject is over 18, the information referenced, the individuals or agencies consulted, statements and conclusions) and documents it in a memorandum for review and approval by the FFS Supervisor.
>
> - The FFS then will forward the memo to the care provider facility case manager to be included in the unaccompanied alien child's case file and to the ICE Detention and Removal Office (DRO) Field Office Juvenile Coordinator (FOJC) for inclusion in the unaccompanied alien child's A-file.
>
> At any time, an unaccompanied alien child in ORR care or his/her designated legal representative may present new information or evidence that he/she is 18 or older for re-evaluation of an age determination.  New information will be reviewed and evaluated by the FFS and, if necessary, the FFS Supervisor, in a timely manner and shared with the DRO FOJC to determine if the current placement is appropriate.  If the new information or evidence indicates that an individual who is presumed to be an unaccompanied alien child is actually an adult, then HHS will coordinate with the assigned FOJC to immediately transfer the individual to an adult DRO facility.

(Doc. 1-8 at 11).

### 2. Petitioner's Claims As To ORR

One of Petitioner's central claims is that ORR violated statutory law, and its own guidelines, when it determined that his birth date was in 1998, not 2001. (*See, e.g.*, Doc. 17 at 3 ["ORR's age determination violates 8 USC § 1232(b)(4) and binding policy."].) Accordingly, Petitioner seeks (1) a declaration that ORR violated the law and (2) an injunction requiring ORR to "immediately rescind" its finding. (Doc. 1 at 30.)

These claims are not properly before the Court.  Petitioner is proceeding by way of a petition for habeas corpus.  "The federal habeas statute straightforwardly provides that the proper respondent to a habeas petition is 'the person who has custody over [the petitioner].'"  *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) (quoting 28 U.S.C. § 2242).  Thus, because "[t]he writ of habeas corpus functions to grant relief from unlawful custody or imprisonment . . . [a]bsent custody by the authority against whom relief is sought,

jurisdiction usually will not lie to grant the requested writ." *Campillo v. Sullivan*, 853 F.2d 593, 595 (8th Cir. 1988).

Here, ORR (a component of HHS) does not have custody of Petitioner. Instead, he has been in the custody of ICE (a component of DHS) since October 2018. (Doc. 1 ¶ 1 ["Petitioner is currently in the custody of Respondents DHS and ICE."].) Given this backdrop, it is unclear how the Court could, via a writ of habeas corpus, order ORR to provide the relief that Petitioner seeks. 28 U.S.C. § 2243 (when issued, a writ of habeas corpus "shall be directed to the person having custody of the person detained").

In an attempt to overcome this obstacle, Petitioner argues that ORR's faulty age determination controlled and infected the ICE proceedings that ensued. (Doc. 17 at 6 ["Because ICE's age determination relies on ORR's age determination, and ORR's age determination has and will continue to impact Imran's removal case because it has been entered into evidence in immigration court, Imran asks this Court finds that it was arbitrary and capricious and made in violation of 8 U.S.C. 1232(b)(4) and enjoin ICE and EOIR from applying ORR's decision to him."].) This claim is inaccurate—ICE was required to make its own determination concerning Petitioner's age. *Matter of M-A-C-O-*, 27 I&N Dec. 477, 479 (BIA 2018) ("Neither the TVPRA nor any other authority of which [the BIA is] aware states that a DHS or HHS determination of UAC status is binding on an Immigration Judge in removal proceedings."). *Cf. Flores*, 862 F.3d at 867 ("[T]he statutory framework enacted by the HSA and TVPRA does not grant ORR exclusive and autonomous control over the detention of unaccompanied minors."); *id.* at 876 ("The HSA and TVPRA contain no indication that they are intended to encompass the entire immigration framework for unaccompanied minors, or to shift all related responsibilities to ORR. The statutes do not grant ORR exclusive authority over unaccompanied minors for all purposes and in all contexts.").[6] Nevertheless, even if ICE had improperly relied on

---

[6] *See also* United States Immigration and Citizenship Services ("USCIS") Memorandum, *Updated Procedures for Determination of Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children*, HQRAIO 120/12a (May 31, 2019), ("To ensure that USCIS is making . . . jurisdictional determinations in a manner consistent with Immigration Judge determinations on the same issue under *Matter of M-A-C-O-*,

1    the ORR age determination during later proceedings, this would not justify the issuance of
2    a writ of habeas corpus compelling ORR to rescind its earlier finding.  Instead, the remedy
3    would be to issue a writ of habeas corpus directed at ICE, the agency currently exercising
4    custody over Petitioner.

5        Petitioner also contends that ORR's age determination is interfering with his ability
6    to apply for "Special Immigrant Juvenile Status (SIJS) under New York law."  (Doc. 2 at
7    10, 19.)  However, Petitioner has not suggested that ORR's determination would have some
8    sort of estoppel effect in a future SIJS proceeding.  Rather, Petitioner's position seems to
9    be that he can't begin the SIJS process until he is released from ICE custody. (Doc. 18 at
10   6 ["[E]ach day that Imran spends detained in Arizona is a day when he is not in New York,
11   with family, in school, and able to pursue additional relief from removal through Special
12   Immigrant Juvenile Status."].)  Again, the remedy for this would be to issue a writ to ICE,
13   not to order ORR to rescind its earlier determination.

14       The Court also notes that, under any calculation, Petitioner is now over the age of
15   18.  Thus, even assuming for the sake of argument that ORR's age determination was
16   inaccurate, Petitioner would not be entitled to return to ORR's custody.  Although
17   Petitioner asserts in Grounds Two and Three of the Petition that ICE mishandled his
18   custody arrangements once he reached the age of 18 based on the "illegal age
19   redetermination" (Doc. 1 ¶¶ 70-76), these again are claims that are fundamentally directed
20   toward ICE and would be remedied by the issuance of a writ to ICE.

21       The bottom line is that the relief Petitioner seeks against ORR—a declaration that
22   ORR's age determination was invalid and an injunction compelling ORR to rescind it—
23   would not redress his alleged injuries.  *Hewitt v. Helms*, 482 U.S. 755, 761 (1987)
24   ("Redress is sought *through* the court, but *from* the defendant. . . .  [W]hat makes

---

USCIS is returning to making independent factual inquiries in all cases in order to determine whether the individual met the UAC definition on the date of filing the asylum application. . . . The asylum officer must assess whether the applicant established that he or she was under 18 years old at the time of first filing the asylum application."), *found at* https://www.uscis.gov/sites/default/files/document/memos/Memo_-_Updated_Procedures_for_I-589s_Filed_by_UACs_5-31-2019.pdf

- 12 -

1  [declaratory judgment] a proper judicial resolution of a 'case or controversy' rather than an advisory opinion . . . is in the settling of some dispute which affects the behavior of the defendant towards the plaintiff."); *Mayfield v. United States*, 599 F.3d 964, 972 (9th Cir. 2010) (finding lack of standing where the government would "not be required to act in any way that will redress [the plaintiff's] past injuries").  Thus, Petitioner lacks standing to pursue these particular forms of relief. *Davis v. FEC*, 554 U.S. 724, 734 (2008) (a party invoking federal jurisdiction bears the burden of demonstrating standing "for each claim he seeks to press and for each form of relief that is sought") (quotation omitted); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) ("To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.") (quotation omitted).

Finally, putting aside these jurisdictional hurdles, Petitioner's challenge to ORR's age determination would fail on the merits. Petitioner's argument is that "ORR . . . violated [its] own policies and the statute by failing to take into account all evidence of age . . . and by relying *exclusively* on a false or fraudulent document, despite the fact that inconsistent or fraudulent document are specifically contemplated in ORR policy as factor that complicates age determinations—not an exclusive reason to send a child to adult detention." (Doc. 1 ¶ 37, emphasis added.)[7]

This argument fails on both the facts and the law. First, ORR did not rely "exclusively" on evidence that Petitioner had used a fake identification document when traveling through Central America. Instead, ORR also relied on a dental radiograph, which indicated an 88.5% probability that Petitioner was an adult. ORR case managers are

---

[7] Petitioner repeats this claim several times in his accompanying memorandum. (Doc. 2 at 2, emphasis added ["ORR['s] . . . *sole evidentiary basis* for the decision to send Imran to adult detention is an assertion that Imran travelled to the U.S. using a passport with a 1998 date of birth and an unsubstantiated report that he had a birth certificate with a 2002 date of birth instead of his correct 2001 date of birth."]; *id.* at 11-12, emphasis added ["When ORR . . . redetermined Imran's age, the *only purported evidence* [it] cited was an allegation that he had travelled with a passport containing an adult date of birth and reports that he had given that adult date of birth while travelling in other countries."].)

specifically instructed to consider such radiographs when conducting age determinations. *See* ORR Guide § 1.6.2 (identifying "Medical Age Assessments," including "the use of imaging technology, such as radiography," as one of the enumerated categories of evidence that ORR case managers "should seek . . . when conducting age determinations"). The TVPRA also contemplates their use, on a "non-exclusive" basis, when making an age determination. 8 U.S.C. § 1232(b)(4). Thus, Petitioner's challenge rests on an inaccurate factual premise.[8]

Second, there is no merit to Petitioner's contention that the ORR Guide prohibits any consideration of the use of false identification documents. To be sure, section 1.6 of the ORR Guide acknowledges that the use of "[c]ontradictory or fraudulent identity documentation and/or statements" presents "challenges" when "determining the age of individuals in custody." But recognizing that a particular category of evidence presents challenges isn't the same thing as forbidding any consideration of that category of evidence. Indeed, section 1.6 expressly requires ORR to consider "the totality of *all* available evidence" when making an age determination. Adopting Petitioner's approach, which would preclude ORR case managers from placing any weight on the fact that an individual made inconsistent statements (or presented false documents) concerning his or her age, would thus conflict with section 1.6. Petitioner's approach would also violate section 1.6.2, which identifies "[s]tatements provided by the unaccompanied alien child regarding his or her age or birth date" as one of the categories of evidence ORR case managers "should seek" when making an age determination.

In short, although this Court very well may have reached a different conclusion had it been presented with the same evidence, Petitioner has not demonstrated that ORR violated its guidelines (or statutory law) by basing its age determination on a combination

---

[8] In his reply, Petitioner belatedly attempts to address the radiograph evidence by arguing that "[t]he accuracy of age determination through dental x-rays is subject to widespread debate" (Doc. 17 at 1; Doc. 17-3) and by submitting new expert declarations, which were apparently never presented during the ORR or ICE proceedings, that challenge the accuracy of the radiograph report on which the ORR case manager relied (Docs. 17-1, 17-2). This approach fails. A litigant may not seek to advance a new argument, based on new evidence, for the first time in a reply.

of Petitioner's use of false identification documents and a radiograph indicating that Petitioner was an adult. *Compare B.I.C. v. Asher*, 2016 WL 8672760, *6 (W.D. Wash. 2016) (habeas petitioner was likely to succeed on challenge to ORR's age determination because "the undisputed evidence is that ORR relied exclusively on . . . radiographic analysis in determining petitioner to be over 18 years old" and "the plain language of the TVPRA requir[es] the non-exclusive use of radiographs").

### 3. Petitioner's Claims As To ICE

As noted, ICE is required to follow the TVPRA and its implementing procedures when making an age determination "for children in [its] custody." *See* 8 U.S.C. § 1232(b)(4). S*ee also* 8 C.F.R. § 236.3(c)(1) ("For purposes of exercising the authorities described in this part, DHS shall determine the age of an alien in accordance with 8 U.S.C. 1232(b)(4). Age determination decisions shall be based upon the totality of the evidence and circumstances."). Petitioner accuses ICE of committing the same error he accuses ORR of committing—violating its "own policies and the statute by failing to take into account all evidence of age" and instead "relying exclusively on a false or fraudulent document." (Doc. 1 ¶ 37.)

As an initial matter, it should be noted that ICE officials considered Petitioner's age at several different points and for several different reasons. First, in October 2018, an ICE official determined that ICE had the authority to detain Petitioner because he was an adult. Second, in January 2019, after Petitioner submitted additional evidence concerning his age, an immigration judge denied Petitioner's request for release on bond, concluding he was a flight risk (a decision Petitioner never appealed). Third, in July 2019, an immigration judge denied Petitioner's request for asylum and based that conclusion, in part, on a determination that Petitioner had made false statements concerning his age (a decision pending appeal before the BIA). Finally, in November 2019, Petitioner's current counsel sent an email to several ICE officials, which was apparently unconnected to any pending proceeding, that included additional pieces of evidence concerning Petitioner's age.

Given this backdrop, Respondents argue that (1) the Court lacks jurisdiction over

any claim related to ICE's "determin[ation], independent of ORR, that Petitioner is not a former UAC" because it is a "discretionary custody determination[]" and (2) jurisdiction is also lacking because "Petitioner has been adjudicated by the Immigration Court to have entered the United States as an adult" and "Petitioner failed to administratively exhaust that claim." (Doc. 15-1 at 7, 11-15.) Petitioner responds that he "has never asked this Court to reverse the Immigration Judge's factual findings or his denial of bond. Rather, [Petitioner] instead points to those decisions as the severe prejudice that results when ICE and ORR fail to follow the TVPRA's age determination statute and their own policy." (Doc. 17 at 8.) Petitioner argues that he is simply presenting the claim that "the government has violated the TVPRA and its own age determination policy, which are entirely separate statutory schemes from the INA [Immigration and Nationality Act]," and contends his claim is thus not subject to the jurisdiction-stripping statutes that apply to INA-based claims. (*Id.*)

The law is not a model of clarity concerning the extent of a district court's jurisdiction to review "age determination" decisions by ICE. Other courts, when presented with similar claims, have concluded they possess jurisdiction because the claims challenge ICE's detention authority, not its discretionary decision to detain in a particular case. *See, e.g., R.R. v. Orozco*, 2020 WL 3542333, *5 (D.N.M. 2020). Thus, the Court will simply assume, for purposes of this case, that it possesses jurisdiction to review Petitioner's challenge to ICE's initial decision to categorize him as an adult and detain in on that basis.

As noted, Petitioner entered ICE custody on October 18, 2018. (Doc. 13-2 at 3.) The accompanying form explained that "ORR . . . contacted ERO regarding this Bangladeshi citizen claiming UAC. The subject has a [birth certificate] indicating [date of birth] of . . . 2002. . . . BITMAP data . . . matched the names and [date of birth] the subject used on his way through Central America and Mexico using [his] true name[] and [date of birth]. This subject's true [date of birth] is . . . 1998. Subject is no longer designated a UAC under the TVPRA." (*Id.*) Thus, ICE based its initial age determination on (1) Petitioner's claim that he was a UAC, (2) the birth certificate possessed by Petitioner

(which suggested he was a UAC), and (3) BITMAP data (which suggested he was not a UAC).

In his memorandum, Petitioner argues that ICE erred by failing to consider several additional categories of evidence—specifically, his "birth certificate, school records, immunization records, and consistent statements about his 2001 date of birth." (Doc. 2 at 11-12. *See also* Doc. 17 at 7-8 [same].)  This evidence, however, was not available to ICE at the time it made its age determination in October 2018.  Indeed, much of this evidence was proffered for the first time in November 2019, via an informal email not tethered to any official proceeding.  (Doc. 1-7 at 2.)[9]  Thus, Petitioner is left with the argument that ICE erred by assigning a negative inference to his use of false identification documents.  But as discussed in the preceding section, nothing in the ORR Guide prohibits such an inference (and forbidding it would conflict with the ORR Guide's imperative to consider "all" evidence).[10]

Petitioner has therefore failed to demonstrate that ICE violated its "own policies and the statute" when making the challenged age determination or that his detention in ICE custody pursuant to that determination was (and is) illegal.[11]  Accordingly, Ground One is dismissed.

…

…

---

[9] The Court disagrees with Petitioner's assertion that ICE Officer Christopher Miller's January 27, 2020 declaration (Doc. 13-2 at 10), which offers a superficial outline of past events, was "justification for ICE's decision" and bootstraps later acquired evidence into the equation. (Doc. 17 at 6-8.)

[10] Similar to the ORR Guide, ICE's agency guidance document—entitled "Age Determination Practices for Unaccompanied Alien Children in ICE Custody" (Doc. 17-3)—acknowledges that "contradictory or fraudulent documents and statements . . . and unavailable documentation on date of birth" present "challenges" during the age-determination process but does not preclude ICE from evaluating conflicting evidence and making a determination based on its assessment of all information before it.

[11] Petitioner's contention that "the IJ and DHS failed to comply with 8 [U.S.C. §] 1232(b)(2) by not notifying HHS of a known or suspected unaccompanied child in their custody" (Doc. 17 at 9 n.1) lacks merit.  At the time of apprehension, DHS notified HHS of Petitioner's claim that he was under 18 years old and transferred him into HHS custody. Petitioner identifies no authority supporting his view that § 1232(b)(2)(B) requires agencies to re-notify HHS of a recurrent minor claim.

B.  **Grounds Two and Three**

If a UAC in the custody of HHS "reaches 18 years of age and is transferred to the custody of" DHS, the TVPRA provides that DHS "shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight" and that "[s]uch alien shall be eligible to participate in alternative to detention programs . . . which may include placement of the alien with an individual or an organizational sponsor, or in a supervised group home." 8 U.S.C. § 1232(c)(2)(B).

In Grounds Two and Three, Petitioner argues that, "due to the illegal age determination," ICE did not afford him these benefits. But as discussed above, there was no illegal age determination. Thus, Petitioner's claims in Grounds Two and Three necessarily fail—the considerations set forth in section 1232(c)(2)(B) apply only when a UAC enters HHS custody before the age of 18, reaches the age of 18, and is then transferred into DHS custody. They do not apply when, as here, the transferee is determined to have never been a UAC.

C.  **Grounds Four and Five**

"[D]etention during deportation proceedings [i]s a constitutionally valid aspect of the deportation process," *Demore*, 538 U.S. at 523, and the Immigration and Nationality Act provides a "complex statutory framework of detention authority," *Prieto-Romero v. Clark*, 534 F.3d 1053, 1057 (9th Cir. 2008). Where an alien falls within the statutory scheme "can affect whether his detention is mandatory or discretionary, as well as the kind of review process available to him if he wishes to contest the necessity of his detention." *Prieto-Romero*, 534 at 1057. *See also Casas-Castrillon v. Department of Homeland Sec.*, 535 F.3d 942, 945 (9th Cir. 2008) (an alien's entitlement to habeas corpus relief "turns in part on locating him within the statutory framework of detention authority"); *Rodriguez v. Marin,* 909 F.3d 252, 255 (9th Cir. 2018) (remanding to the district court to "determine 'the minimum requirements of due process' for each subclass" of detained aliens).

Under 8 U.S.C. § 1226(a), DHS has discretionary authority to arrest and detain an

alien "pending a decision on whether the alien is to be removed from the United States." *See also Jennings*, 138 S. Ct. at 841. After an alien is detained, DHS makes an initial custody determination and may release the alien from detention. 8 U.S.C. § 1226(a); 8 C.F.R. § 236.1(d). If, as here, an alien is denied release, he may seek a custody redetermination hearing before an IJ. 8 C.F.R. §§ 1003.19(a), 1236.1(d). And, if denied release from custody on bond, an alien may request another custody redetermination hearing "upon a showing that the alien's circumstances have materially changed since the prior bond determination." 8 C.F.R. § 1003.19(e).

Petitioner argues that his detention violates his substantive due process rights because "Respondents' interest in detaining [him] in order to effectuate removal is severely undermined by the violations of controlling statutes, regulations and guidelines, all aimed at protecting unaccompanied youth from suffering harm through unwarranted detention." (Doc. 1 ¶ 79.) This claim lacks merit. As set forth above, Petitioner has not demonstrated a violation of the "controlling statutes, regulations and guidelines . . . aimed at protecting unaccompanied youth."

Next, Petitioner alleges that his "ongoing prolonged detention without a [bond] hearing violates due process," and to justify his continued detention, the government must prove by clear and convincing evidence that he poses a danger or flight risk. (Doc. 1 ¶ 80.) This, too, fails. Petitioner has not been subject to prolonged detention without a bond hearing. Petitioner received a bond hearing before an IJ and the IJ made an individualized determination that his continued detention was justified because he is a flight risk. Although Petitioner alleges that the IJ "denied his bond . . . application[] in reliance on [ORR's] age redetermination" (Doc. 1 ¶ 58), he does not claim that the hearing or the IJ's resulting custody determination was constitutionally deficient. Nor does he not provide any legal authority or reasoning to support a claim that he is constitutionally entitled to an *additional* bond hearing.[12] Indeed, the supporting cases cited by Petitioner (Doc. 1 ¶¶ 53,

---

[12] To that end, Petitioner concedes that he has not requested a second custody redetermination hearing by an IJ. Although "[t]he exhaustion requirement is prudential, rather than jurisdictional, for habeas claims," *Hernandez v. Sessions*, 872 F.3d 976, 988

60) involved individuals who were subject to prolonged detention without ever having received a bond hearing before an IJ. *See, e.g., Jamal A. v. Whitaker*, 358 F. Supp. 3d 853, 859 (D. Minn. 2019) ("It is important to bear in mind the context: The detention that is being examined here is the detention of a human being who has never been found to pose a danger to the community or to be likely to flee if released.").

Without more, Petitioner has failed to show that his continued detention violates the Fifth Amendment's Due Process Clause. *Prieto-Romero*, 534 F.3d at 1068 ("Prieto-Romero ha[d] not been denied procedural due process while in custody. He [had] received a bond hearing that afforded him an individualized determination of the government's interest in his continued detention by a neutral decisionmaker.").

**IT IS ORDERED:**

(1) Petitioner's petition for a writ of habeas corpus (Doc. 1) is **denied**.

(2) Petitioner's motion for preliminary injunction (Doc. 2) is **denied**.

(3) Petitioner's Motion to Expedite (Doc. 20) is **granted**, to the extent that the Court sincerely attempted to expedite its consideration of this matter (although the complexity of the matters presented made it impossible to issue an immediate ruling).

(4) The Clerk of Court shall enter judgement accordingly and terminate this case.

Dated this 24th day of July, 2020.

_____
Dominic W. Lanza
United States District Judge

---

(9th Cir. 2017), it makes sense to require exhaustion here because a redetermination request could obviate the need for habeas corpus intervention. *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007); *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004).